Filed 11/14/14  P. v. Carisalas CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MIGUEL CARISALAS,<br><br>    Defendant and Appellant. | F064481<br><br>(Super. Ct. No. VCF169926C)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

Mark Farbman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

As the result of two separate gang-related shootings, a jury convicted Miguel Carisalas of two counts of first degree murder (Pen. Code, § 187, subd. (a)),[1] six counts of attempted murder (§§ 664, 187, subd. (a)), and several other crimes. Numerous firearm and gang enhancements were found true. The jury could not reach a decision at the penalty phase of the trial. When the prosecution elected not to seek the death penalty in a second penalty trial, Carisalas was sentenced to two terms of life without the possibility of parole and a consecutive sentence of 285 years to life.

The proceedings were conducted in three parts: (1) a competency hearing, (2) the guilt phase of the trial, and (3) the penalty phase of the trial. Carisala argues there were errors in each part of the proceedings. We will discuss the evidence and issues in each phase separately.

Carisalas contends the trial court committed two errors in the competency trial. First, he asserts the trial court erroneously excluded portions of the testimony of one of his expert witnesses. Second, he argues the trial court erred when it refused to modify the jury instructions pursuant to his request. We find no merit to the jury instruction argument. We need not decide the merits of the trial court's exclusionary ruling because, even if the court erred, Carisalas is not entitled to relief because the error was harmless as he did not suffer any prejudice.

The second phase of the proceedings was the guilt phase of the trial. Carisalas claims the trial court erred when it refused to redact certain portions of the interviews he gave to the police. Carisalas argued, in essence, that statements made by the interrogating detectives that asserted various facts related to the crimes should have been excluded because the probative value of these statements was substantially outweighed by their prejudicial effect. (Evid. Code, § 352.) Once again, we need not reach the

_____

[1]All further statutory references are to the Penal Code unless otherwise stated.

merits of the argument because, even if error occurred, it was harmless as Carisalas did not suffer any prejudice from the error.

The third phase of the proceedings was the sentencing phase. Carisalas asserts, and the People agree, that several minor errors occurred at sentencing. We will strike two enhancements and remand the matter to the trial court to clarify the restitution minute order and to correct errors in the abstract of judgment. These corrections do not affect Carisalas's prison sentence.

## I.    The Information

The information was organized based on the date of the charged offenses. For a shooting that occurred on May 27, 2006, Carisalas was charged with the murder[2] of Randall Shaw (count 1), shooting at an occupied vehicle[3] (count 2), and the attempted murders[4] of Daniel Costilla, Alex Barrientoz, Roger Castillo, Henry Castillo,[5] and Joseph Matus (counts 3 through 7). Each count also alleged the following enhancements: (1) personal use of a firearm,[6] (2) the crime was committed for the benefit of a criminal street gang,[7] and (3) personal infliction of great bodily injury.[8] In addition, the murder count alleged the following special circumstances: (1) multiple murder, (2) the murder was perpetrated by shooting a firearm from a motor vehicle, and (3) the murder was

---

[2]Section 187, subdivision (a).

[3]Section 246.

[4]Sections 664 and 187, subdivision (a).

[5]We will refer to Roger and Henry by their first names, not out of disrespect but to avoid any confusion to the reader.

[6]Section 12022.53, subdivisions (b) through (d).

[7]Section 186.22, subdivision (b)(1)(C) and (5).

[8]Section 12022.7, subdivision (a).

3.

carried out to further the purposes of a criminal street gang,[9] thus making Carisalas eligible for a penalty of death or life in prison without the possibility of parole.

For the shootings that occurred on August 20, 2006, Carisalas was charged with conspiracy to commit murder[10] (count 8), the murder[11] of Matthew Ramirez (count 9), shooting from a motor vehicle[12] in the murder of Ramirez (count 10), the attempted murder[13] of Dominic Delarosa (count 11), and shooting from a motor vehicle[14] in the attempted murder of Delarosa (count 12).  The information also alleged the following enhancements related to these shootings:  (1) the crimes were committed for the benefit of a criminal street gang (counts 8 through 12),[15] and (2) personal or vicarious use of a firearm (counts 8, 9, and 11).[16]  Finally, the information contained two special circumstance allegations related to the murder of Ramirez—(1) the murder was perpetrated by shooting a firearm from a motor vehicle, and (2) the murder was carried out to further the purposes of a criminal street gang.[17]

---

[9]Section 190.2, subdivision (a)(3), (21), and (22).

[10]Sections 182, subdivision (a)(1) and 187, subdivision (a).

[11]Section 187, subdivision (a).

[12]Former section 12034, subdivision (c) (now section 26100, subdivision (c)).

[13]Sections 664 and 187, subdivision (a).

[14]Former section 12034, subdivision (c).

[15]Section 186.22, subdivision (b)(1)(C), (4), and (5).

[16]12022.53, subdivisions (b) through (e)(1).

[17]Section 190.2, subdivision (a)(21) and (22).

## II.     Competency Hearing

During the proceedings defense counsel raised concerns about Carisalas's competency. The issue arose because shortly before the crimes for which Carisalas was being tried, he was shot in the head. The bullet caused severe brain damage and remains lodged in the back of his brain. The prosecution brought a motion challenging the admissibility of proposed expert testimony. The trial court elected to hold a combined *Kelly*/*Frye*[18] and Evidence Code section 402 hearing.

### *Kelly/Frye Evidence Code Section 402 Hearing*

Carisalas called as his first witness, Ruben Gur, Ph.D., who is a neuropsychologist and a professor of neuropsychology at the University of Pennsylvania School of Medicine. Gur has been working with structural and functional imaging of the brain to help understand brain behavior relationships for over 30 years. He has authored over 300 peer-reviewed publications, all of which deal with brain function and behavior.

Gur began working with positron emission tomography (PET) scans in 1979 and continues to do so today. He explained the nerve cells in the brain need sugar and oxygen to "fire." To perform a PET scan, the scientist mixes glucose (sugar) with a molecule that has an excess of positively charged positrons, usually fluorene 18, and injects the mixture into the patient's bloodstream. The mixture is picked up by the brain. The fluorene 18 does not break down, but the positrons will travel short distances until they meet an electron. When a positron collides with an electron, a small explosion occurs and two photons are emitted. These two photons travel 180 degrees from each other and exit the skull.

---

[18]*People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.

Detectors placed on the skull send a signal to a computer every time they detect a photon. When two detectors that are facing each other simultaneously detect a photon strike, the computer[19] can locate where in the brain the positron collided with the electron. In other words, the sensors detect where the fluorene 18 is located in the brain. Over a period of time, these photon strikes enable the computer to calculate the rate of glucose metabolism in the brain.

Every time a neuron in the brain "fires," it must refuel, or obtain more glucose. Because there is a direct correlation between glucose consumption and neuron activity, by mapping the photon strikes the computer can determine which parts of the brain are utilizing glucose and how frequently the brain neurons "fire." Conversely, if there are few or no photon strikes in a region of the brain, it is an indication that a portion of the brain is not working properly. The statistics drawn from a specific patient are then compared to the firing pattern of a normal brain, defined as the mathematical average obtained from the testing of numerous healthy brains. This comparison shows "the extent to which the nerve cells in that region fire and use energy at a normal rate." The PET scan is generally accepted as a reliable way to measure abnormal metabolism in various regions of the brain.

Gur explained he would look for statistically significant differences when the firing patterns from a specific patient were compared to the firing patterns of a normal brain. Sixty-eight percent of all firing patterns will fall within one standard deviation from the norm. The firing patterns of over 95 percent of brains will fall within two standard deviations from the norm. For each specific area of the brain, firing patterns

---

[19]We use the term "computer" generically to refer to the process of collecting and tabulating the data. The testimony was unclear as to how the process of collecting and tabulating the data occurs, but undoubtedly numerous complex computer functions are involved.

that differ from the norm by more than one standard deviation, but less than two standard deviations, are considered clinically significant. Firing patterns that differ by more than two standard deviations from the norm are "unusual and highly significant."

Gur testified that different parts of the brain control and regulate different aspects of behavior. The major functions of the different regions of the brain have been known for a significant period of time, although new discoveries are still being made. There is general agreement in the scientific community about what each of the regions does for cognition and behavior.

The most complex behavior is cognition and it primarily occurs in the cerebral cortex, or the outer layers of the brain. Understanding language is a cognitive operation, as is understanding the nature and purpose of proceedings and an individual's own status and condition. The ability to make rational decisions also is a cognitive function. The PET scan measures the capacity of the brain in regions that are relevant to cognition, and this fact generally is accepted in the scientific community. The PET scan, however, does not measure cognition. The PET scan provides information directly relating to the physiological integrity of the brain, and you need physiological integrity to have full capacity to engage in cognitive operations. He explained that he could look at parts of the brain related to understanding the spoken language, the ability to assess the environment, the ability to think about the future, the ability to plan, and the ability to consider the risks and benefits of different decisions. It is generally accepted in the scientific community that the functional integrity of various regions in the brain, and expressing that function in terms of standard deviations from the norm, is relevant to the issues in a criminal trial.

Gur further explained that in some limited circumstances, for example, if an individual had no metabolism in a certain portion of the brain, he could predict that a certain function would be impaired. He repeatedly emphasized, however, that while he could predict in some patients a certain type of behavior, he could not predict a specific

behavior. For example, test results might indicate an individual with a specific brain injury would likely engage in risky behavior, but he could not predict in what type of risky behavior that individual would engage. More importantly, Gur emphasized that PET scans mainly were used to explain behavior, not predict behavior.

Gur noted there were abnormalities in Carisalas's frontal lobe that generally would impair his (1) ability to make his behavior conform to social norms, (2) decisionmaking, and (3) ability to make long-range plans that required impulse inhibition and regulating emotion. He further explained, "[I]f you ask me is Mr. Carisalas able to understand the proceedings, help his attorneys in preparing his defense and all that stuff, this behavior that is happening right now and has happened in the past, I would say somebody with this PET scan results is more likely than not to have deficits in the capacities that are needed in order to do all these things."

Gur was not aware of anyone who would assert PET scans could not be used to explain behavior. In fact, "it is well established that PET results can explain behavior." As the prosecutor, who apparently did not understand the testimony, continued to rely on obsolete information and mischaracterizations of the testimony to challenge the witness, Gur again explained, "All I can say is that everybody accepts the use of PET to measure glucose metabolism. They accept that glucose metabolism relates to behavior. I don't think that it will ever be possible to look at the PET and say this person is incompetent to assist their attorney. You couldn't look at the PET and say this person is a defendant in a trial. But what you can say is that metabolic activity is abnormal in specific brain regions. [¶] Using methods that are scientifically acceptable, I don't think there will be any serious colleague who will dispute the validity of the methods we have used, and that that abnormal activity in those regions is associated with behavior. And all the links that I made are generally accepted. I don't think there would be any serious neuroscientist who will disagree with anything that I said in my report in terms of the link between

8.

brain function -- regional brain function and behavior. [¶] I think what you're reading is opinions about diagnosing illness. We are not trying to diagnose an illness here."

Carisalas also presented the testimony of Arthur Kowell, M.D., who is a neurologist in private practice and holds a teaching position at UCLA. Kowell's testimony was directed at electroencephalography (EEG) and quantitative EEG (QEEG). Kowell explained these tests are tools to determine whether parts of the brain are malfunctioning, and, for this case, whether there were malfunctions in the parts of the brain that are essential for understanding legal proceedings. Similar to Gur's testimony, Kowell explained that these tests would not tell you if the patient was incompetent to stand trial, but

> "it tells you whether or not there may be a problem that would affect the person's ability to understand court proceedings. It doesn't tell you you'll have abnormalities in the brain that are essential for those functions on this type of technology. That doesn't necessarily mean that they're not going to be able to participate in legal proceedings.

> "Other information is needed, such as, for example, a psychiatric evaluation, neuropsychological evaluation, perhaps other technologies such as CAT scans, MRI scans. For example, if there's evidence of frontal lobe dysfunction in electrophysiological study, then one needs to inquire further through history, examinations of various types, as to what might be responsible for that.

> "For example, if the -- if a quantitative EEG or an EEG or a Beam study showed abnormality in the frontal lobe or the temporal lobe, and investigating it further with imaging study such as MRI or CAT scan, and there was serious loss or damage in those areas, then that would be some corroborative evidence that the person may indeed have an organic reason for not being able to participate in trial proceedings or be legally competent."

Kowell also explained that the frontal temporal regions and, to a lesser extent, the parietal region of the brain are important to the issue of competency. Kowell again clarified that even if there were an abnormality in the frontal temporal lobe or the parietal lobe of the brain, such impairment would not necessarily mean the patient was

9.

incompetent to stand trial. "Again, you would have to do further testing, such as neuropsychological testing, psychiatric evaluation, and imaging studies such as MRIs, CAT scans, PET scans, etc." However, if a patient's brain is damaged in the areas where cognitive functions (reasoning, planning, learning, language, sequencing of functions) take place, that damage is relevant to determining whether the patient is competent, even though the test results by themselves would not conclusively determine competence.

The QEEG performed on Carisalas showed widespread abnormalities, including in the left parietal occipital regions, the right parietal parasagittal occipital region, and the parietal region of his brain. In other words, "Certainly in this particular case there is electrophysiological evidence of brain dysfunction."

Kowell also testified the procedure was generally accepted in the scientific community as a reliable technique for measuring brain function. Kowell confirmed that the EEG is "a valid assessment in the neurologic condition.… [T]he test result is not going to say yes or no this person is competent. You have to -- if the test shows an abnormality that supports brain dysfunction, then one has to look at other corroborative evidence to determine whether or not the person is competent. But several abnormalities in this type of testing says hey, there could be a problem in this patient's brain. Maybe this person is not competent. Then you need to do other evaluations, including psychological testing, psychiatric evaluation and radiologic studies." He repeated this theme during cross-examination. "Just because someone has a frontal lobe abnormality on a quantitative EEG, does that mean they'll necessarily go out and kill somebody? The answer is no. Does that mean they'll be legally competent or incompetent? No. Does that mean they're going to go down at lunchtime and buy a hamburger for lunch rather than a hot dog? No. You need to have other information. [¶] But the importance of this technology is sensitive in showing that there is electrophysiological function of the brain and it requires further information. It may have a very important effect on someone's

10.

legal competency. The keyword is 'may.' You need other information, which I've … said earlier."

Carisalas's final witness was Albert Globus, M.D., who is a psychiatrist and is board certified in psychiatry and neurology. Globus opined that PET scans generally are accepted methods of measuring glucose metabolism in various regions of the brain. The information obtained in a PET scan is relevant to a diagnostic impression because it offers the opportunity to make a diagnosis that bears on the reliability of a mental status examination in a neuropsychological testing.

Globus explained it is common knowledge in psychiatry that various regions in the brain perform specific functions. Globus relied, in part, on the results of the PET and EEG scans in explaining his opinion that Carisalas was incompetent to stand trial.

Globus admitted that many times a defendant's competency can be determined without doing an EEG or PET scan. "But when the issue -- particularly when the issue of malingering is involved or the issue of the extent of the damage to the brain in terms of its eletrophysiological and neurophysiological function is concerned, computerized EEG are very important, if not essential." He also explained that it was "very important to show that there actually is a high likelihood of actual brain damage to rule out malingering, and also to establish the extent of the disturbance that may render a person incompetent to stand trial."

Globus provided the following explanation when asked by the trial court whether a QEEG could determine if a defendant was malingering or not: "No. It determines -- it's a two-step process, your Honor. It determines that there is an abnormality in the brain. You could have an individual who passes the neuropsychological test as competent or who looks through the mental status in the psychiatric history as being incompetent, but who is malingering. Without the QEEG, or as you call it [the] computerized EEG and/or the PET scan, it may have been impossible to distinguish those two cases."

When the trial court expressed some confusion, Globus explained, "If you have abnormal findings in the computerized EEG or PET scan, and the areas of the brain that are involved are consistent with the findings of the psychiatric history and mental status examination and the neuropsychological testing, in that case it proves that there is no malingering or less or extremely less likely it is malingering."

The prosecutor next asked some questions about the statistical nature of the analysis. Globus explained, "The important issue here is how different. As statistical differences from the norm increase, the likelihood of their actually showing a behavioral disorder measurable in the mental status examination and the neuropsychological testing rises very steeply." The trial court took exception to this testimony, stating no other expert or literature it had reviewed stated that this comment generally was accepted in the scientific community, so it was unlikely Globus would be able to testify to that comment.

The prosecutor sought from Globus confirmation that the tests did not establish the level of Carisalas's cognitive functioning.

> "Not exactly, because there's a variability between the findings of the scan and the changes in cognition. There are certain areas of the brain that perform certain functions. They should have evidence in the QEEG or the computerized EEG and the PET scan which are consistent with the findings and the mental status examination and in the neuropsychological testing. If they aren't, the likelihood of malingering is very high. If they are, the likelihood of malingering or exaggeration of signs and symptoms are reduced depending on how those findings in the computerized EEG and in the PET scan -- how different are they from the normative values. If those differences are huge, then it supports the diagnosis of [incompetence].[20] But in and of itself, they would not prove incompetence."

[20]The transcript indicates that Globus stated significant differences in the tests from the normative values would support a diagnosis of competence. It is clear from Globus's testimony that large deviations from the norm would support a finding of incompetence. Either Globus misspoke, or the court reporter made an error in transcription.

12.

*Ruling on Motion*

After briefing and argument by the parties, the trial court made its ruling.

"Attachment A that you had in your brief that was filed November 29th entitled, 'Medical/legal applications of PET scans,' this in on Page 91 under Paragraph 10, 'PET Scans in the Courts.' Starting with the third sentence, 'The authors of this article believe that the strong trend is toward the admissibility of testimony based on PET provided that the doctor's able to provide solid testimony about the scan's technical reliability.' I don't think we have an issue on that.

"The next part is what I believe is the operative language for this court, 'And provided that the doctor does not go too far in rendering opinions.' That's exactly the issue here. And I think it's generally accepted easily within the scientific community that PET scans and EEGs are allowed and generally accepted in the scientific community for clinical reasons and in a limited forensic setting. And that forensic setting is exactly what you said originally in your argument this morning. And I'm quoting when you were talking about the *Hose*[21] case.… [¶] … [¶] The *Hose* case stated, 'They allowed PET scans to be admitted because it's exactly the same reason that I proposed to use my experts. What they would say is that it was admitted because it was going to show consistency with and not diagnostic proof of the disease in that case, and that was the subject of that hearing.'

"I don't have a problem with testimony, and I think it's generally accepted in the scientific community for forensic purposes. I'm basing that on all the articles that have been submitted and all the testimony I've read. And I have to say that in listening to the testimony, Dr. Kowell was most persuasive for me. Dr. Kowell said that at most, as I'm interpreting his testimony, you can use those PET scans and EEG results to show that there may be abnormalities in the areas of the brain that are associated with the issues dealing with being able to make decisions in effectively helping—

"[DEFENSE COUNSEL]: Decisions that are necessary for competence?

"THE COURT: Yes. But no farther than that. In other words, Dr. Globus or whoever you want to have testify can certainly say that they felt that those findings of abnormalities in those specific areas were consistent with what they

---

[21]*Hose v. Chicago Northwestern Transp. Co.* (8th Cir. 1995) 70 F.3d 968.

believe were their interviews with the defendant. But to go farther than that and say such things as I believe it's less -- extremely less likely or in any degree showing less likely that Mr. Carisalas was malingering or anything of that nature, I don't find anything in the literature or any testimony that that's generally accepted forensic use in the relevant scientific community."

After an exchange with counsel, the trial court identified the testimony it was excluding:

> "And I believe this was Dr. -- [¶] … [¶] … Globus' testimony. 'They merely provide information regarding defendant's brain scans and how they vary from the averages of a control group; correct?'

> "'A. Yes, the important issue here is different. As statistical differences from the norm increase, the likelihood of there actually showing a behavioral disorder measurable in the mental status examination and the neurophysiological testimony rises very steeply.'

> "There's no acceptance in the scientific community that that extrapolation should be allowed in a forensic setting from the PET scans, and I'm not going to allow such testimony."

### Competency Trial

Globus was the first witness called to testify at the trial. He explained his background in both neurology and psychiatry, including extensive research and publication of various papers. He also has taught in two medical schools. He has been in private practice for over 30 years and currently spends half of his time in forensic psychiatry and the other half in general psychiatric practice. He estimated he has conducted approximately 500 competency exams for various courts.

Globus began by opining that Carisalas was incompetent to stand trial and then explained the basis for his opinion. Globus next explained the development of the brain and the various factors that can affect brain development. Globus explained that Carisalas's childhood inhibited his brain development. Carisalas grew up in poverty, often had little food to eat, became very ill at about one year of age, and was twice bitten (stung) by scorpions when he was a young child. His mother often was depressed and the family was dysfunctional. Carisalas worked in the fields with his father and may have

14.

been exposed to chemicals that could affect brain development. Two of his brothers were shot and killed by police when Carisalas was eight years old. Each of these events could have inhibited Carisalas's brain development. Globus opined Carisalas had suffered brain damage from these experiences.

In addition to his childhood environment, Carisalas was shot in the head in 2006. Globus noted that the wound from the bullet appeared to be small, but the damage caused was great because when the bullet hit the bone, the bullet became deformed. The bullet travelled through the outside of Carisalas's right eye to the back of his head, damaging much of the brain. The bullet dragged bone fragments into the brain, causing additional damage. The brain also was damaged when the bullet hit the skull, causing the head to shake, causing a torsional injury to the brain. Moreover, because the neurons in the brain are connected, the injury to the right side of the brain also caused damage to the left side of the brain. Globus calculated that approximately seven-eighths of Carisalas's brain was either directly or indirectly affected by the bullet. That damage would repair itself to some extent, but after about a year this process would be as complete as it would ever become.

Carisalas suffered cognitive damage as a result of the gunshot wound. He recovered, to a limited extent, from this injury. The extent of recovery would improve if the patient had therapy after the injury, with the "amount of stimulation and the quality of that stimulation [being] very, very, very important." Carisalas did not have any therapy after the injury.

Globus opined that some neuroplasticity, or brain growth, occurred in Carisalas after the bullet wound.

Globus first examined Carisalas on January 6 and 7, 2010. After an examination that lasted about five hours, Globus formed the opinion that Carisalas was incompetent to stand trial. The factors supporting this opinion related to Carisalas's mental status and included (1) his response time to questions was very slow, and (2) he did not understand

15.

many words, and, when given definitions for those words, he could not remember the definitions. Carisalas also had an abnormal affect. He always appeared to be very happy, which was unusual since he was in jail facing charges that could result in the death penalty.

Globus did not detect any evidence that Carisalas was malingering. The time it took to formulate answers was very slow and often Carisalas would give a different answer to the same question if it was asked sometime later in the interview.

Globus ordered a PET scan for Carisalas. He explained the results indicated the three parts of Carisalas's temporal lobe showed decreased function when compared to the average or norm. Those parts also were related to "the process of social judgment that we're talking about, where you understand what your enlightened self-interest is, and what you're going to do and make a decision by it." There also were abnormalities in the frontal cortex, which is very important to executive functions or decisionmaking. In total there were 16 regions in Carisalas's brain that showed abnormal activity. The results from the PET scan were consistent with Globus's findings during his mental exam. Globus testified the results of the scan could not be manipulated by a patient.

Globus also explained the EEG and computerized EEG. These tests demonstrated abnormalities in Carisalas's brain. These abnormalities were consistent with Globus's conclusion that Carisalas was incompetent to stand trial. Specifically, Globus noted that Carisalas had abnormalities on both sides of his brain, the right more than the left. These types of abnormalities normally would lead one to expect difficulties in memory and perception. Globus confirmed that a patient could not manipulate an EEG.

Defense counsel next asked if these results "show limitations in understanding and thinking." The prosecutor objected and, after a discussion, the trial court sustained the objection, stating, "He's already testified that they're consistent with his findings and that's as far as we were going to go. We weren't going to extrapolate the results into that type of question and answer."

16.

Finally, Globus explained that while certain portions of the brain generally are responsible for specific types of functions, the brain actually operates as a whole. Accordingly, the more damage that is done to the brain, the more all of the functions are inhibited, even if the specific part of the brain that is responsible for a function is not damaged. Approximately 70% of Carisalas's brain has some degree of abnormality, with the resulting effect on all parts of his brain. Globus explained that three independent tests confirmed Carisalas's brain was significantly damaged, resulting in severe problems with brain function, including social judgment, leaving no room for dispute.

On cross-examination the prosecutor was able to elicit from Globus that Carisalas recalled the events leading to the current charges, he knew what murder was, he claimed another individual shot the first victim, he admitted he shot the gun in the second shooting but did not believe he hit anyone, and he explained how he shot the gun out of the vehicle in which he was riding.

Globus also noted in his report that the interpreter who aided him when he interviewed Carisalas described Carisalas's speech rate as normal, his vocabulary as accurate, his tone reflecting normal inflection, and he assumed Carisalas had a high school education. The interpreter stated Carisalas appeared to be evasive when asked some questions.

Globus testified Carisalas was able to identify the responsibilities of the various individuals involved in the proceedings. Carisalas never asserted he did not understand what was occurring in his case. Carisalas explained that a criminal sentence meant he would get "time and things like that," the judge "tells you what time you're going to do," the "jury decides whether you're guilty or not," the defense attorney was responsible for "[getting] the minimum sentence, the least possible time," through asking questions of the people who would testify during the trial, and the prosecutor's function was "[t]o try and get the maximum" through making the crime "seem as bad as possible." When asked

17.

how he would decide whether or not he would testify, Carisalas responded, "Once I see how it is going. If I felt like listening to all the lies they're going to say."

Francisco Gomez, Ph.D., is a neuropsychologist. A neuropsychologist is a psychologist who specializes in testing certain types of behaviors after someone has suffered a brain injury. The testing helps the neuropsychologist identify certain parts of functions of the brain that are impaired.

Gomez evaluated Carisalas over a period of two days in late 2008. Gomez concluded that Carisalas was incompetent. To reach this conclusion, Gomez performed a series of standardized tests in Spanish. Carisalas had an overall IQ of 80, which is low or borderline. His verbal and thinking tests were higher, but his ability to process information was lower. This indicated to Gomez that Carisalas processed information very slowly, especially verbal information. Gomez also saw evidence that Carisalas had a tendency to perseverate—or repeatedly use the same strategy. For example, when asked about his trial strategy, Carisalas responded that he simply wanted to see what would happen in trial. Despite different information being provided in the question, Carisalas always responded he wanted to see what would happen in trial. Gomez explained this tactic was common when an individual had brain damage and suggested Carisalas did not understand the consequences of his decisions. Because of his inability to process information, when Carisalas had to make a decision, he was more likely to act impulsively rather than reflectively, i.e., he did not think about how to respond, he merely reacted.

While Carisalas will benefit from a structured setting, such as jail, when he has to make a decision, he has difficulty. "And that's where he becomes overwhelmed and can't make a decision. So when he has issues of plea bargains and what's the consequences of his actions, that's where he has difficulty."

When asked if Carisalas could assist his attorney in a rational manner, Gomez responded, "In that sense I say no. And the reason is he doesn't have the ability to

18.

understand the consequences of his decisions. If the attorney tells him to do this, he's more likely just to go along with it, because he doesn't think. If he's forced to make a decision, then he'll end up doing the responses that he gave me. He just wants to see what happens. He doesn't have a clear strategy, and he has difficulty thinking of a strategy."

Gomez admitted Carisalas understood the roles of the parties and understood that a trial was going to occur. "[H]e understands what he's charged with. He understands that he's in jail. He understands that there's going to be a court proceeding, but he doesn't really think about the consequences beyond that."

Gomez administered tests to determine if Carisalas was malingering. The results indicated Carisalas was not malingering. Gomez opined that Carisalas did not have sufficient mental capacity to comprehend instructions and advice from counsel or the ability to make rational decisions after being given advice. Gomez explained,

> "The testing, the issue that he has difficulty is integrating full information to what he knows or what he believes. He's the type of person that once he decides on something, he has difficulty taking in new information, and in weighing that new information to see how it could affect him. I go back to the example of when I was asking him about issues that could happen if he testified, or if he goes to court, or if he doesn't take a plea agreement or he finds -- is found guilty. His response consistently was, 'Well, I just want to see what happens.'
>
> "So he doesn't take in the information, doesn't weigh it. I never got, like, well, I might think about it or that's a possibility, I might change my mind later on. But nothing like that. It's just that he just wants to see what happens. In other words, nothing. That was consistent with the testing."

On cross-examination Gomez confirmed that Carisalas's major difficulty was in processing verbal information, primarily where he has to process information very quickly. Gomez also agreed that Carisalas understood the role of the participants in the trial and understood he was subject to a death penalty.

The prosecution relied on court-appointed psychologist Stephen Bindler, Ph.D., who is employed as the chief psychologist and chief of mental health at Kern Valley State Prison. Bindler examined Carisalas for approximately one hour with the aid of an interpreter.

When interviewing an individual, Bindler discusses three areas. The first is the individual's ability to understand the charges and the circumstances of the crime with which he or she is being charged to determine if he or she would be able to assist his or her attorney in the defense of the action. The second part of the exam addresses the individual's ability to understand the nature and purpose of the court proceedings. The third part of the exam is a mental status evaluation.

Bindler began by explaining to Carisalas the purpose of the exam. Carisalas stated he understood Bindler's explanation and agreed to be examined. Carisalas knew the name of his attorney and explained he was able to contact him. He also was aware he had been offered a plea, but he refused the offer because the offered sentence was too long. He was cooperative and spoke spontaneously. Carisalas claimed he could not remember most of the events leading to the charges against him. Carisalas explained he had been shot in the head and this injury had affected his memory. Bindler thought it unusual that Carisalas could remember details about when he was shot in the head, but could not remember anything about the crimes with which he was being charged. Bindler interpreted Carisalas's behavior as an evasive tactic.

Carisalas's speech appeared normal, and he was able to communicate clearly. He understood he faced a sentence of life in prison or possibly the death penalty. When he stated he was going to reject the offered plea and sentence, Carisalas appeared to have the attitude that he was not afraid to go on trial. He was aware of his surroundings.

Carisalas knew the purpose of the trial was to determine his guilt, his attorney's role was to defend him, the prosecutor's purpose was to get the maximum penalty, the judge's purpose was to make sure everything was done correctly, and the jury was

required to listen to the evidence and decide if he was guilty. Based on these answers, Bindler determined Carisalas had at least a layman's understanding of the process and proceedings.

Bindler opined that Carisalas was competent to stand trial because Carisalas understood the nature of the proceedings and appeared to be able to provide pertinent information to his attorney to enable his attorney to defend him. Bindler found no evidence of a severe psychiatric disorder that would impair Carisalas's ability to understand or function in the trial. Bindler formed this opinion even though Carisalas claimed he could not remember the circumstances leading to the charges. Bindler opined that since Carisalas could remember in detail the events surrounding his injury, he also should have been able to remember in detail the events leading to the two murders with which he was being charged.

Bindler read Gomez's report and there was nothing in the report that would change his opinion. He also read Globus's report but claimed he could not understand it. "As I recall, Dr. Globus' report is one that was based on a lot of medical tests, fancy studies, x-ray stuff. I'm just a country psychologist. A lot of that stuff is over my head. I'm not medically trained, and I'm not qualified to evaluate any of that stuff. But the things that I could read and understand that connected with me didn't change my opinion at all."

The prosecution also presented testimony from two deputy sheriffs working at the local jail. The first described an altercation in which Carisalas was involved. After the altercation one of the deputies observed an instrument that could have been used as a weapon underneath Carisalas. The second deputy searched Carisalas after the altercation. He found a small razor blade hidden under Carisalas's tongue. Finally, the prosecutor presented the testimony of Tulare County Sheriff's Detective Cesar Fernandez. Fernandez and another detective interviewed Carisalas shortly after Carisalas was shot in 2006. Carisalas was uncooperative. He refused to answer questions or sign a medical

release form. Carisalas also stated he did not want any further investigation and signed a nonprosecution form.

### Closing Arguments and Verdict

The prosecutor spent a good portion of his argument disparaging Gomez and Globus as "hired guns" who would provide whatever opinion they were paid to provide. The relevant part of his argument focused on Carisalas's ability to answer questions and to explain the roles of the various participants in the proceedings. The prosecutor encouraged the jury to find Carisalas understood the charges against him, understood the penalty he faced, and had the ability to communicate with counsel regarding the evidence against him. Accordingly, the prosecutor argued Carisalas was competent within the meaning of the law.

Defense counsel argued the gunshot wound to the head suffered by Carisalas caused such significant damage to his brain that he could not assist counsel in his defense. Defense counsel focused on Carisalas's impaired ability to process verbal communication. Defense counsel also pointed out that Bindler spent only one hour with Carisalas before forming an opinion and completely disregarded the medical testimony about Carisalas's brain injury.

The jury deliberated for approximately 90 minutes before finding Carisalas competent to stand trial.

### Discussion

Carisalas raises two issues related to the competency hearing. First, he argues that after the Evidence Code section 402 hearing, the trial court erroneously limited Globus's opinion. The trial court ruled Globus could testify that the results of the EEG and PET scan were consistent with his diagnosis of incompetence, and that those test results could not be manipulated by Carisalas. The trial court limited Globus's opinion in only one aspect. Specifically, Globus indicated that because the results of the scans showed Carisalas's brain function was approximately two standard deviations below the norm, it

22.

was highly unlikely Carisalas was malingering. The trial court ruled that this opinion generally was not accepted in the scientific community and therefore was inadmissible.

It would appear the trial court erroneously limited Globus's opinion. The *Kelly/Frye* test "applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156.) In other words, the *Kelly/Frye* test "is applicable only to 'new scientific techniques.' [Citations.]" (*People v. Leahy* (1994) 8 Cal.4th 587, 605.) "[A] technique may be deemed 'scientific' for purposes of *Kelly/Frye* if 'the unproven technique or procedure appears *in both name and description* to provide some definitive truth which the expert need only accurately recognize and relay to the jury.' [Citation.]" (*Id.* at p. 606.)

The testimony offered by Globus does not appear to fall within the definition of a "new scientific technique" as that term is used in the *Kelly/Frye* test. It was an opinion. Accordingly, it would appear the trial court's reliance on the *Kelly/Frye* test to exclude Globus's proposed testimony was erroneous.

We need not decide this issue, however, because any error was harmless. The opinion excluded by the trial court was that the extent of damage to Carisalas's brain made it extremely unlikely he was malingering. Globus testified about the results of the PET scan and the EEG and that those results were consistent with his opinion that Carisalas was incompetent.

For the limited opinion evidence excluded by the trial court to be relevant, the prosecution would have needed to elicit testimony and rely on the contention that Carisalas was malingering. Bindler, the only expert witness called by the prosecution, never accused Carisalas of malingering. To malinger is to "pretend to be ill or injured in order to avoid responsibilities or work." (Webster's II New College Dict. (2001) p. 663.) Bindler testified he thought some of Carisalas's answers to questions about the charges against him were evasive. To be evasive is to be "[i]ntentionally ambiguous or vague."

23.

(*Id.* at p. 388.) Bindler opined, therefore, that Carisalas was being vague when answering questions, not pretending to be ill or injured.

Indeed, Bindler did not dispute that Carisalas had been shot in the head and had suffered a head injury. Moreover, he agreed with Gomez's mental status findings and did not express any disagreement with Gomez's evaluation of Carisalas's IQ. Bindler disagreed with Gomez's conclusion about competency. Bindler, however, took a very pragmatic approach when forming his opinion. He relied on Carisalas's ability to explain the role of the various individuals involved in the trial, his recollection of events, and his knowledge that he faced the death penalty in this trial. These factors suggested to Bindler that Carisalas was competent to stand trial.

Nor did the prosecutor suggest in closing argument that Carisalas was malingering. Instead, he attacked Globus and Gomez and relied on the same factors as Bindler to argue Carisalas was competent. The prosecutor acknowledged the brain injury suffered by Carisalas, but asserted he was competent despite the injuries he had suffered. To be sure, the prosecutor noted that Carisalas appeared to be evasive when meeting with Bindler, but he did so in the context of pointing out that Carisalas was able to answer the same type of question when questioned by Globus.

To summarize, Carisalas cannot establish any prejudice because malingering was not an issue in this case. Since malingering was not an issue, the trial court's decision to exclude Globus's opinion that the test results strongly suggested Carisalas was not malingering was not prejudicial.

Instead, the competency trial was about the question of whether the largely undisputed facts would support a finding of incompetence. The prosecution relied on Carisalas's ability to identify the responsibilities of each party in the trial, his knowledge of the charges against him, as well as the potential penalty he faced, his rejection of a proposed plea agreement, and his ability to explain the events leading to his arrest. In other words, the prosecution took the direct path provided by Carisalas's answers to

24.

questions, as supported by Bindler, to argue he was competent within the meaning of the law.

Carisalas relied on a more nuanced view of the law and the evidence. His experts opined the brain damage caused by the bullet disrupted higher level thinking, making it impossible for him to make reasoned decisions and interfering with his ability to participate in the trial because of his limited ability to process verbal information. The jury apparently was convinced that the prosecution advocated the proper approach.

The difference in approaches between the prosecution and defense leads to the second issue raised by Carisalas—the jury instructions. The trial court instructed the jury with CALCRIM No. 3451, which, as relevant here, instructed the jury that Carisalas

> "is mentally competent to stand trial if he can do all of the following: [¶] 1. Understand the nature and purpose of the criminal proceedings against him; [¶] 2. Assist, in a rational manner, his attorney in presenting his defense; [¶] AND [¶] 3. Understand his own status and condition in the criminal proceedings.
>
> "The law presumes that a defendant is mentally competent. In order to overcome this presumption, the defendant must prove that it is more likely than not that the defendant is now mentally incompetent because of a mental disorder."

Prior to trial, Carisalas requested the instruction be modified to comply with his interpretation of Supreme Court precedent. The proposed modification would have resulted in the following instruction, with the proposed additions to the instruction in italics:

> "The defendant is mentally competent to stand trial if he has the *capacity* to do all of the following: [¶] 1. Understand the nature and purpose of the criminal proceedings against him; [¶] 2. Assist, in a rational manner, his attorney in *preparing and* presenting his defense, *which includes the capacity to make rational decisions and to testify*; [¶] AND [¶] 3. Understand his own status and condition in the criminal proceedings.
>
> "*Competence to stand trial does not consist merely of passively observing the proceedings. Rather, it requires the mental acuity to see,*

25.

*hear and digest the evidence, the capacity to communicate with counsel in helping prepare an effective defense, and the ability to testify.*

"The law presumes that a defendant is mentally competent. In order to overcome this presumption, the defendant must prove that it is more likely than not that the defendant is now mentally incompetent because of a mental disorder *and/or developmental disability.*

"[*A developmental disability is a disability that begins before a person is 18 years old and continues, or is expected to continue, for an indefinite period of time. It must be a substantial handicap and does not include other handicapping conditions that are solely physical in nature. Examples of developmental disabilities include mental retardation, cerebral palsy, epilepsy, autism, and conditions closely related to mental retardation or requiring treatment similar to that required for mentally retarded individuals.*]"

Carisalas asserts the trial court erred in rejecting his proposed additions to CALCRIM No. 3451.

The statutory basis for competency determinations is found in section 1367. This section prohibits the trial or punishment of anyone who is mentally incompetent. The section also provides that a defendant is mentally incompetent "if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." The first two elements of CALCRIM No. 3451 closely parallel Penal Code section 1367 so as to be almost identical.

In federal courts, the standard is stated somewhat differently. A defendant is mentally incompetent if he or she does not have sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding and does not have a rational or factual understanding of the proceedings against him or her. (*Drope v. Missouri* (1975) 420 U.S. 162, 172 (*Drope*); *Dusky v. United States* (1960) 362 U.S. 402 (*Dusky*).)

With these general principles in mind, we turn to the modifications to CALCRIM No. 3451 requested by Carisalas. The first modification was the insertion of the term

"capacity" for the word "can" in the first sentence of the portion of the instruction quoted above. This requested modification did not change the meaning of the instruction in any way. A defendant cannot understand the nature and purpose of the proceedings against him or her unless he or she has the capacity to do so. If he or she lacks the capacity to do the listed tasks, then he or she cannot do them and must be found incompetent. Either formulation leads to the same result. Accordingly, the trial court did not err in denying the request.

Moreover, the authority cited by Carisalas does not support his argument. *Drope* used the term "capacity" in discussing the history of the rule that the state cannot try an incompetent defendant. When discussing the rule in federal court, however, the Supreme Court did not use the word "capacity." "Accordingly, as to federal cases, we have approved a test of incompetence which seeks to ascertain whether a criminal defendant '"has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him."' *Dusky*[, *supra,*] 362 U.S. at [p.] 402."' (*Drope, supra,* 420 U.S. at p. 172.)" Carisalas's reliance on *Drope* is misplaced.

The second requested modification sought to add the word "preparing" to the second element so that the instruction would read, "Assist, in a rational manner, his attorney in *preparing and* presenting his defense." Carisalas also relied on *Drope* as authority for this request.

Once again we conclude the request was a simple matter of semantics that added nothing to CALCRIM No. 3451. In order to present a defense, one must prepare the defense. If a defendant is competent to assist his or her attorney in presenting a defense, he or she also is competent to assist his or her attorney in preparing his or her defense. We cannot conceive of any rational benefit to be gained using one formulation of the instruction over the other. While the trial court would not have erred had it granted the request, there certainly was no error in denying the request.

27.

We also note that Carisalas's reliance on *Drope* once again is misplaced. While the Supreme Court used the word "preparing" when discussing the defendant's defense, it was once again used when discussing the history of competency statutes. There was no attempt to set forth a rule of law or a constitutional requirement. The formulation of the rule in federal courts enunciated by the Supreme Court did not contain the word "preparing." This parsing of *Drope* is not persuasive legal authority.

The third requested modification was to the second element of CALCRIM No. 3451, which states, "Assist, in a rational manner, (his/her) attorney in presenting (his/her) defense." Carisalas requested addition of the phrase "which includes the capacity to make rational decisions and to testify."[22] We conclude there was no error in the trial court's decision to reject this request.

We begin by noting the concepts included in the proposed addition already are incorporated in CALCRIM No. 3451. The phrase "capacity to make rational decisions" is simply another way of saying that Carisalas must be able to assist his attorney in a rational manner. To add the phrase requested by Carisalas would make the instruction redundant. Similarly, the decision to testify or to not testify is part of preparing a defense. Therefore, CALCRIM No. 3451 included the concepts that Carisalas must be able to make rational decisions, including the decision whether to testify.

Nor does Carisalas present any compelling authority to support this proposed addition. He cites *Godinez v. Moran* (1993) 509 U.S. 389 and *Cooper v. Oklahoma* (1996) 517 U.S. 348 as authority for his proposed modification. Both cases explain why the various decisions a criminal defendant will have to make during trial require the defendant to be competent. Neither case remotely suggests that any such decision must

---

[22]If the trial court accepted the requested modification, the second element would read, "Assist, in a rational manner, his attorney in presenting his defense, which includes the capacity to make rational decisions and to testify."

be included in a jury instruction. These citations did not support the requested modification.

The fourth proposed modification was the addition of a new sentence to the instruction: "Competence to stand trial does not consist merely of passively observing the proceedings. Rather, it requires the mental acuity to see, hear and digest the evidence, the capacity to communicate with counsel in helping prepare an effective defense, and the ability to testify." The request was based on a passage from *Odle v. Woodford* (9th Cir. 2001) 238 F.3d 1084 that was taken out of context. The issue in *Odle* was whether the trial court erred in failing to conduct a competency hearing for Odle. The appellate court began by observing that a defendant may not be prosecuted while he or she is incompetent. (*Id*. at p. 1087.) The appellate court then observed that if there is a bona fide doubt about the defendant's competence, the "trial judge must satisfy himself that the defendant is able to understand the proceedings against him and assist counsel in preparing his defense. [Citations.]" (*Ibid*.) This standard is, of course, the standard in the federal courts and is consistent with the standard in California.

The additional sentence quoted by Carisalas was taken from the discussion portion of *Odle* wherein the appellate court was explaining its decision to require a competency hearing. The appellate court was not requiring, or even suggesting, the quoted sentence should be included in a jury instruction.

Carisalas's motion was based on the statements from various cases, none of which discussed jury instructions. The portions of the cases on which Carisalas relied were taken out of context and utilized in a manner never intended by the publishing courts. This explains why the trial court was underwhelmed by the request and denied it in its entirety. Moreover, the majority of the requested modifications already are encompassed in CALCRIM No. 3451. Accordingly, the trial court did not err in denying Carisalas's proposed modifications.

29.

Carisalas's argument on appeal is similarly unavailing. He asserts his defense was based on his inability to make reasoned choices, which he states is the same as "rational decisions." As we have explained, however, this argument is pure semantics. CALCRIM No. 3451 informed the jury that to be competent Carisalas had to be able to assist his attorney in a rational manner. The assertion that making rational decisions is somehow different than assisting his attorney in a rational manner is not persuasive. CALCRIM No. 3451 permitted defense counsel to make whatever arguments he wished, including the argument that because of his brain injury Carisalas was unable to make rational decisions and thus could not rationally assist his attorney.

Carisalas also contends the trial court was required to grant his motion because the proposed modifications were pinpoint instructions. We disagree.

Pinpoint instructions "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.)

The proposed modifications to CALCRIM No. 3451 did not pinpoint the crux of Carisalas's case. Instead, they attempted to add to the elements or expand the definition of "incompetency" as defined by California law. And, the case law cited by Carisalas did not support the proposed modifications. Carisalas's claim of error thus fails.

## III. Trial

The second part of the proceedings was the guilt phase of the trial. This trial was before a different jury than that which heard the issue of competency. Carisalas argues the trial court made only one error in this phase of the proceedings. The trial court refused to redact from his police interrogation certain statements made by the detectives who were questioning him.

30.

*Testimony*

The main prosecution witnesses were two coconspirators in the murder of Ramirez. Quinn Ambriz and Hector Escobar each entered into a plea agreement that included a requirement they testify truthfully. In exchange, Ambriz was to receive a sentence no longer than 11 years in prison, while Escobar agreed to a stipulated sentence of 20 years eight months in prison.

### May 27, 2006, Murder of Shaw

On May 27, 2006, Ambriz testified he was at a quinceañera, which is a traditional Mexican celebration for a girl's 15th birthday, along with Juan Curiel, Benjamin Alvarez and Carisalas. Carisalas had a gun with him that night. Curiel drove a Jeep Grand Cherokee. At one point an argument broke out involving Curiel, Carisalas, and another group. Carisalas pulled out his gun but put it back into his waistband because the other group was leaving. Curiel and Carisalas followed the other group in Curiel's vehicle.

Escobar testified he saw Carisalas and Curiel at the quinceañera. He left the party to get a jacket from his house. As he was returning to the party, he saw a pickup truck being followed by Curiel's Jeep Grand Cherokee.

Later that night Escobar met up with Carisalas, Curiel, and some other friends. They all went to another party. At that party Curiel explained how he had chased after the pickup truck and eventually was able to pull up alongside of it. When he did so, Curiel said Carisalas shot the driver of the truck (Shaw) in the head. While Curiel was making these statements, Carisalas was sitting nearby, nodding his head as if in agreement. While Curiel was describing the shooting, Carisalas was motioning with his hand as if he were firing a gun.

Months later Escobar was talking with Carisalas. Escobar told Carisalas that he had seen a poster indicating a reward for information related to Shaw's murder. Carisalas said the amount of money offered was insufficient. Carisalas also admitted he shot Shaw one time in the head.

31.

Alvarez invited Carisalas and the others to the quinceañera, which was being held for his cousin. Alvarez observed Carisalas with a gun in his possession at the party. As Alvarez, Curiel, and Carisalas were leaving the party, Alvarez heard some people yelling, "Norte." Curiel and Carisalas left the party together in Curiel's Jeep Grand Cherokee.

Alvarez went to another party after he left the quinceañera. Curiel and Carisalas arrived at this party after Alvarez. When Curiel and Carisalas arrived, they appeared to be "pumped up." Carisalas said that after he and Curiel left the quinceañera, they chased someone and shot at a "buster," or a Norteño. Carisalas stated the "busters" made him feel "pissed off."

Barrientoz was with Shaw on the night Shaw was murdered. The two were part of a group that included Matus, Costilla, Henry, and Roger. The group ended up at a quinceañera. The group left in Shaw's pickup when they became uncomfortable because another group at the party was "mad-dogging" them. As they were driving away from the party, Costilla yelled out, "Norte, Norte." A short while later a dark-colored SUV passed them and parked on the side of the road. As Shaw drove past the SUV, Barrientoz saw someone from the SUV shoot at Shaw's pickup. Bullets hit the back of the pickup. Shaw yelled he had been shot in the leg as he drove away. The SUV caught up to them and pulled up beside Shaw's pickup. The SUV was occupied by several Hispanic males. Barrientoz heard more gunshots and eventually the truck crashed. Barrientoz got out of the vehicle and ran. Barrientoz could not identify anyone who had been shooting at his group.

Costilla's testimony was similar to Barrientoz's. Costilla was able to identify the vehicle as a dark-colored Jeep Grand Cherokee. He denied yelling "Norte" as the group left the quinceañera.

**August 20, 2006, Attempted Murder of Dominic Delarosa and Murder of Matthew Ramirez**

On August 20, 2006, at approximately 8:40 p.m., Delarosa was riding his bicycle on Avenue 404 when two vehicles passed by him. Someone leaned out of the second vehicle, an SUV, and Delarosa heard a gunshot. He stopped, but did not realize the bullet had grazed his chin until later.

Ambriz explained that on August 20, 2006, he was at a local park with numerous people, including Carisalas, Adan Cruz, Jose Delgadillo, and Escobar. Those five decided to look for "busters." The five drove to Delgadillo's house in two vehicles—Ambriz and Cruz in one vehicle and Carisalas, Escobar, and Delgadillo in Escobar's vehicle. The group picked up guns at Delgadillo's house. Delgadillo obtained a shotgun for himself and gave Carisalas a handgun. Delgadillo then got into the vehicle with Ambriz and Cruz, while Escobar and Carisalas got into Escobar's vehicle. The group drove around looking for members of the Norteño criminal street gang. As they approached a liquor store in Cutler, Delgadillo said, "There's a buster," referring to Ramirez. Delgadillo then shot Ramirez.

Escobar testified that he met with Carisalas, Delgadillo, Cruz, and Ambriz at the park. The five decided to drive around looking for Norteños. Delgadillo was upset because a few days before someone had shot at his house. The five then went to Delgadillo's house to pick up guns. Delgadillo retrieved a shotgun and a handgun. Delgadillo gave the handgun to Carisalas. Delgadillo got into the vehicle with Cruz and Ambriz. Carisalas got into the vehicle Escobar was driving.

Escobar followed Cruz. When they stopped at a stop sign, they were passed by two youths on bicycles, one of whom was wearing a red shirt. One of the youths yelled out, "Fucking scrap." Carisalas leaned out the window and shot once at the youth. Carisalas attempted to fire again, but the gun misfired. A short while later Escobar saw a shot being fired from the vehicle Cruz was driving and saw Ramirez drop to the ground.

33.

Ramirez, Ramirez's brother and his wife, and two friends drove to a liquor store. Ramirez was shot in the back as he was walking toward the entrance to the store. Ramirez yelled he was shot and could not move his legs. No one had a cell phone to call an ambulance, so Ramirez was placed in the vehicle and driven to a relative's house where an ambulance was called.

### Gang Testimony

Ambriz was 15 at the time the crimes occurred. He was "jumped" into the Sureño gang when he was 13 or 14. He identified Carisalas, Cruz, Delgadillo, and Escobar as Sureño gang members.

The prosecution's expert witness testified (1) the Sureño criminal street gang was a criminal street gang within the meaning of section 186.22, subdivision (f); (2) Carisalas, Curiel, Delgadillo, Escobar, Ambriz, and Cruz were all members of the Sureño criminal street gang; and (3) the shootings were committed for the benefit of and in association with the Sureño criminal street gang.

*Verdict*

Carisalas was found guilty of each count, and each enhancement and special circumstance was found to be true.

*Discussion*

The only trial issue raised by Carisalas involves the admission of his interrogation by law enforcement shortly after his arrest. Carisalas did not seek to suppress the statement, but instead his motion sought to redact from the statement numerous comments made by the interrogating detectives that defense counsel alleged contained hearsay, lacked foundation, were argumentative, or whose probative value was substantially outweighed by the prejudicial effect of the statement.

Defense counsel conceded the statements were admissible, but asserted questions by the interrogators that adopted as true statements apparently made by the

coconspirators lent an air of veracity to the testimony of those witnesses. Defense counsel explained his concerns to the trial court during argument of the motion:

> "The concern is the evidence in this case rests really primarily on the credibility of the three people that are coming in here, [Alvarez], [Escobar], and [Ambriz]. They're going to say stuff and we already read prior statements. What is in the transcripts of the interview throughout is basically law enforcement giving them a ringing endorsement that everything they say is true. That's what this cop says over and over again. This cop tells [Carisalas], 'You're a liar,' which is purely argumentative.

> "The prosecutor is getting things in front of a jury that would never come from an officer while they're sitting on the stand. The Court would never allow it. This is one way to get what is extremely prejudicial, argumentative stuff in front of a jury. Once the jury … hears this cop over and over again saying, '[Carisalas], you're not telling the truth, you know what happened. You're not being straight with us,' it really removes, I think to a prejudicial extent, any way of an independent analysis by the jury. That's our fear. Things could be redacted out of here because there's [*sic*] enough statements from [Carisalas] and straightforward questions that aren't reliant upon I heard this from that bunch of people who are trying to throw this on you.

> "There are lots of references that would give the jury a text of his responses and his involvement without having to put in the cop's own argumentative belief if you're telling the truth or not. That's what we're basically doing."

The trial court essentially adopted the prosecutor's assertion that since the tactics utilized by the law enforcement interrogators were not improper, the entire interview was admissible. "My ruling is that this is -- and I've reviewed both statements, these are classic interrogations by officers to a suspect. Many times, as we all know, officers make statements to a suspect that are not true, but that's sanctioned by the case law, or will ask leading questions, or will ask argumentative questions. Those are all legitimate questions."

Defense counsel admitted such tactics were permissible in an interview and would not support a motion to suppress the statement, but asserted the question of whether such

statements were admissible was a different issue. The trial court rejected the argument. "No, I think there's case authority that says that an interrogating officer can state untruths as being true to a suspect. That's a proper technique." The trial court then confirmed that such authority rendered such statements by the officer admissible at trial. The trial court also asserted Carisalas's rights could be protected through cross-examination and an appropriate jury instruction.

Pursuant to the trial court's ruling, the interviews were played for the jury. The interview was conducted in Spanish, so the prosecutor handed out transcripts to the jurors and also had the translation imposed on the bottom of the video recording, essentially a subtitle. During a break in the playing of the interviews, the trial court instructed the jury

> "Before we take a break, I want to advise all of you that in these police interrogations what's important is the answers given by the defendant, not the questions. The questions are only relevant as they pertain to what the answers are by the defendant. And many times the interrogator, the police interrogator, will interject something into the interrogation that may not be true, may, in fact, be false. But case law says that that's a proper and legal technique for interrogation purposes.

> "You need to keep that in mind that necessarily just because an officer is saying it doesn't make it true. Once again, what's relevant is what the answers are and how the person responds in relation to the questions asked."

Carisalas argues the trial court erred in failing to redact the interrogation because the probative value of the evidence substantially was outweighed by its prejudicial effect. (Evid. Code, § 352.) Carisalas has grouped the offensive questions into the following categories: (1) assertions that unnamed sources and other suspects incriminated Carisalas, (2) statements opining Carisalas was guilty or the unnamed sources were being truthful, (3) assertions Carisalas was lying, (4) assertions that physical evidence incriminated Carisalas, and (5) statements that the trial judge would know Carisalas killed with indifference.

36.

We begin by noting the trial court's analysis was erroneous. The trial court determined that simply because there was no ground to suppress the statement, the entirety of the statement was admissible at trial. Defense counsel, however, did not move to suppress the statement. He moved to redact the assertions of fact by the interrogating officers on various grounds. The analysis the trial court should have undertaken was to weigh the probative value of the officer's statements and assertions against the prejudice suffered by Carisalas by the admission of the statements and assertions. In making this analysis, the trial court should have considered Carisalas's demeanor and responses to the assertions, as well as any other factors it found relevant to the issue.

The evil of permitting the statements and assertions of the interrogating detectives is evident. "First, the procedure enabled the People to restate their case, largely in the form of double hearsay: [The interrogating officer's] extrajudicial statements concerning information he had received from others. Second, the procedure enabled the People to rehabilitate some of their badly impeached witnesses in impermissible fashion." (*People v. Sanders* (1977) 75 Cal.App.3d 501, 507-508.) The trial court erred in failing to recognize this issue and to conduct an appropriate analysis pursuant to Evidence Code section 352.[23]

The trial court's analytical error does not necessarily mean the evidence was erroneously admitted. To obtain relief Carisalas must establish not only that the evidence should have been excluded because its prejudicial effect substantially outweighed its probative value (Evid. Code, § 352) but also that the admission of the evidence resulted

---

[23]The record does not indicate the trial court explicitly conducted a weighing of the prejudicial effect of the statements versus their probative value, even though defense counsel made the argument. The trial court did make statements asserting the probative value of the interviews was very relevant, suggesting it may have been conducting an Evidence Code section 352 analysis. We cannot be certain, however, that the trial court conducted the proper analysis on this record.

in a miscarriage of justice. (Cal. Const., art. VI, § 13; *People v. Brown* (2003) 31 Cal.4th 518, 534.) A miscarriage of justice occurs if there is a reasonable probability the defendant would have obtained a more favorable result in the absence of error. (*People v. Montes* (2014) 58 Cal.4th 809, 876.)

We need not decide if the trial court's analytical error resulted in the erroneous admission of evidence because, even if the evidence should have been excluded, Carisalas cannot establish the error resulted in a miscarriage of justice.

We begin with the two interviews, which we have reviewed carefully. Carisalas was interviewed on consecutive days in early September 2006. The first interview concerned the Ramirez murder and the second interview concerned the Shaw murder. In both interviews, the detectives interviewing Carisalas spent the majority of the interrogation encouraging Carisalas to tell his story. The interrogations were conducted in a polite, relaxed, and respectful manner. Neither interview was confrontational or otherwise objectionable. Each detective attempted to elicit from Carisalas his version of events and, in an attempt to convince Carisalas to confess, each detective utilized his or her knowledge of the events, which each claimed was obtained from other suspects. Comments were made by both detectives about how the incidents occurred. In the first interview the detective repeatedly stated she knew certain facts, but it was clear her knowledge was based on information obtained from other suspects.

Three factors are significant in our analysis. First, the majority of both interviews focused on attempting to establish background facts. For example, much of the first interview was an attempt to get confirmation from Carisalas that he was with the other gang members in one of the vehicles, which he eventually admitted. Much of the second interview was spent attempting to obtain an admission from Carisalas that he was at the quinceañera with Curiel and that he left the party with Curiel in the green Jeep Grand Cherokee. Carisalas claimed he could not remember anything related to the quinceañera

or being with Curiel. Discussion of the shootings encompassed a very small portion of the interviews.

Second, the facts stated by the detectives, which, once again, clearly were based on information obtained from coconspirators, were essentially the same facts to which the prosecution's witnesses testified at trial. While this could be seen as bolstering the witnesses against Carisalas, these witnesses were not impeached to the same extent as the witness in *Sanders* was impeached by his lying under oath on at least two occasions. And, unlike *Sanders*, Carisalas's statements in the interview and independent witnesses also tied Carisalas to the crimes.

It is true that both Ambriz and Escobar initially denied any knowledge of any of the incidents, but, once they decided to come forward, their testimony essentially was consistent on the major points. It also is true, as Carisalas asserts at length, that there were internal inconsistencies between the testimony of the prosecution's three primary witnesses, Escobar, Ambriz, and Alvarez. But these inconsistencies were on minor matters and certainly not related to the significant issues in the case.

The primary issue in the Shaw murder was identity of the person who shot Shaw. Escobar, Ambriz, and Alvarez did not see the shooting of Shaw. Ambriz and Alvarez identified Carisalas as possessing a gun at the quinceañera, and all three witnesses identified Carisalas as the individual who entered the passenger's seat of Curiel's Jeep Grand Cherokee that chased after Shaw's vehicle. Other witnesses testified that a dark-colored SUV chased Shaw's vehicle and shot at it repeatedly. Escobar and Alvarez testified they saw Carisalas at another party after the shooting. Escobar testified to statements made by Curiel that the trial court ruled were adopted by Carisalas. These statements constituted an admission that Carisalas shot Shaw while Curiel drove his Jeep Grand Cherokee. Alvarez testified that at this party Carisalas admitted shooting at a "buster." Escobar also testified that some months later Carisalas admitted shooting Shaw in the head. Carisalas did not have any evidence to contradict this testimony and simply

argued these witnesses were not believable. This testimony was simply overwhelming evidence of Carisalas's guilt.

The primary issue in the Ramirez murder and the Delarosa attempted murder was whether the five participants entered into a conspiracy to shoot Norteños. No evidence was introduced that would suggest that someone other than Delgadillo murdered Ramirez. Nor was any evidence introduced to suggest that Carisalas did not meet with the other four conspirators at the park.

While Carisalas suggests there was little evidence of an agreement reached at the park, both Ambriz and Escobar testified the five agreed to look for "busters," went to Delgadillo's house and obtained guns, and then drove around until Delgadillo shot Ramirez and Carisalas shot at Delarosa. Carisalas admitted in his interview that he met with the other four gang members at the park and admitted he was with them when Ramirez was murdered. He also admitted hearing the shot that killed Ramirez, but denied knowing who had shot at Ramirez. Carisalas also denied shooting at Delarosa, claiming he was driving Escobar's vehicle when that shooting occurred. Carisalas's credibility was seriously damaged, however, because of his incredible claims of ignorance. He claims he was driving Escobar's vehicle when Delarosa was shot at, but denied knowing who had shot at Delarosa. It is inconceivable Carisalas could have been in the car while Escobar, or anyone else, shot at Delarosa and not know a shot had been fired.

The third important factor was that the jury was instructed by the trial court that the questions asked by the detectives were not evidence and that detectives often lied to suspects in an interrogation. Thus, the jury knew the detectives could be fabricating evidence and were focused on the answers given by Carisalas when confronted with these "facts." This instruction was intended to focus the jury on the evidence at trial—not on the assertions made by the detective when trying to elicit information from Carisalas.

Having reviewed the entire record, we are convinced that any error in refusing to redact the interviews as requested by Carisalas did not cause Carisalas any prejudice, let alone result in a miscarriage of justice. Accordingly, we reject the claim of error.

## IV.    Penalty and Sentencing

The penalty phase of the trial was tried before the same jury that heard the guilt phase. The prosecution introduced evidence of the devastating effect the murders of Shaw and Ramirez had on their families. Defense attorneys presented the testimony from Carisalas's family members to describe his childhood and also presented evidence similar to that presented at the competency hearing regarding the medical implications of the brain damage Carisalas suffered when he was shot in the head some three months before the Shaw murder.

The jury was unable to reach a verdict, and the prosecution elected to not retry the penalty phase of the trial. Carisalas was sentenced to two terms of life without the possibility of parole, plus two consecutive firearm enhancements of 25 years to life, for the murders of Shaw and Ramirez and consecutive terms of 15 years to life, plus a firearm enhancement of 25 years to life for the attempted murder convictions in counts 3, 4, 5, 6, and 7. Finally, he was sentenced to a term of 15 years to life, plus a firearm enhancement of 20 years to life, for the attempted murder of Delarosa in count 11. The sentences for the remaining counts and the remaining enhancements were stayed pursuant to section 654. To summarize, Carisalas is serving two terms of life without the possibility of parole, plus a consecutive term of 285 years to life.

### *Sentencing Issues*

The first sentencing issue raised by Carisalas addresses an error in the abstract of judgment. Carisalas was convicted of the attempted murder of Delarosa in count 11. The jury also found true firearm enhancements pursuant to section 12022.53, subdivisions (b) and (c). The trial court sentenced Carisalas to a term of 15 years to life, plus a

41.

consecutive term of 20 years to life pursuant to section 12022.53, subdivision (c).  The trial court stayed the section 12022.53, subdivision (b) enhancement.

The abstract of judgment indicates Carisalas was sentenced to a term of 15 years to life, plus an additional term of 25 years to life pursuant to section 12022.53, subdivision (d).  As the People concede, this clerical error must be corrected.

The second sentencing issue concerns counts 10 and 12.  In these counts, Carisalas was convicted of shooting from a motor vehicle, in violation of former section 12034, subdivision (c).  Count 10 identified Ramirez as the victim, while count 12 identified Delarosa as the victim.  The jury also found true that each count was committed for the benefit of a criminal street gang, in violation of section 186.22, subdivision (b)(1)(C).

The People concede two errors occurred when the trial court imposed a sentence on these two enhancements.  First, count 12 of the information charged Carisalas with a section 186.22, subdivision (b)(1)(B) enhancement, not a subdivision (b)(1)(C) enhancement.  Therefore, an enhancement was found true by the jury with which Carisalas was not charged.  Second, section 186.22, subdivision (b)(1)(C) requires the trial court to impose an additional 10-year term if the defendant is found to have committed a violent felony for the benefit of a criminal street gang.  This section defines a violent felony as those felonies listed in section 667.5, subdivision (c).  Shooting from a motor vehicle, in violation of former section 12034, subdivision (c), was not listed as a violent felony in section 667.5, subdivision (c).  Accordingly, the section 186.22, subdivision (b)(1)(C) enhancements that were imposed (and stayed) on these two counts must be stricken.

The third sentencing issue identified by Carisalas concerns count 8.  Carisalas was found guilty of conspiracy to commit murder in this count, and the jury found true the allegation that a principal in the crime personally and intentionally discharged a firearm, causing death within the meaning of section 12022.53, subdivisions (d) and (e)(1).  The People concede the abstract of judgment is incorrect because it erroneously lists two

42.

section 12022.53, subdivision (d) enhancements instead of the single subdivision (d) enhancement found true by the jury. The abstract of judgment must be corrected to reflect a single section 12022.53, subdivision (d) enhancement on this count.

The fourth sentencing issue identified by Carisalas involves a mathematical error in the calculation of restitution. The parties and the record agree the trial court ordered restitution as follows: (1) $14,035.26 to the Victim Compensation and Government Claims Board for funeral expenses for both Shaw and Ramirez, (2) $1,320 to the Ramirez family for unreimbursed funeral expenses, (3) $4,313.57 to the Shaw family for unreimbursed funeral expenses, and (4) $4,153 for the value of Shaw's truck that was damaged when Shaw was murdered. The total restitution award to the Shaw family was 8,466.57 ($4,313.57 + $4,153), and the total restitution ordered by the trial court was $23,821.83.

The minute order from the restitution hearing does not reflect these calculations. The minute order states the People's request for restitution of $4,153 for the Shaw "[pickup] recalculation requesting $10,401.57 is so ordered." First, Carisalas, not the People, argued the value of the pickup was $4,153. Second, the total of $10,401.57, which apparently was to be the total owed to the Shaw family, is unsupported by the record. Third, the first page of the minute order states the total owed to the Shaw family is $9,642.80, and the total restitution owed is $24,998.06, both of which are incorrect. We will remand the matter to the trial court to clarify the record.

## DISPOSITION

The section 186.21 subdivision (b)(1)(C) enhancements imposed on counts 10 and 12 are stricken. The matter is remanded to the trial court for issuance of a corrected abstract of judgment and a corrected minute order to reflect accurately the restitution ordered by the trial court. The amended abstract of judgment shall correct the errors we

43.

have identified in counts 8, 10, 11, and 12. A copy of the corrected abstract of judgment and minute order shall be provided to all appropriate agencies. The judgment is affirmed in all other respects.

_____
CORNELL, Acting P.J.

WE CONCUR:


_____
GOMES, J.


_____
OLIVER, J.*

_____

*Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.